**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. __1:12-cv-03236___

KIMM NORDMAN, individually and on
behalf of all others similarly situated,

      Plaintiff,

v.

GOLIVE! MOBILE, LLC, a Delaware
limited liability company, and AIRPUSH,
INC., a Delaware corporation,

      Defendants.

---

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

---

Plaintiff Kimm Nordman ("Plaintiff" or "Nordman") brings this Class Action Complaint ("Complaint") against Defendants GoLive! Mobile, LLC ("GoLive") and Airpush, Inc. ("Airpush") (collectively, "Defendants") to enjoin their practice of deceptively causing her and other Android smartphone users to incur unauthorized monthly charges on their wireless telephone bills and to obtain redress for all persons injured by such conduct. Plaintiff, for her Complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences, and as to all other matters, upon information and belief, including investigation conducted by her attorneys.

## NATURE OF THE ACTION

1.      The recent proliferation of smartphones[1] has given rise to a burgeoning mobile content industry[2] that offers consumers a wide array of software products and subscription services for use with their mobile devices. Due at least in part to its relative infancy, this new industry remains generally free from effective private or public regulatory oversight. Such circumstances present unique opportunities for nefarious actors to exploit consumers in novel ways. Unfortunately, Defendants GoLive and Airpush, two mobile-technology companies, chose to capitalize on such opportunities.

2.      As alleged in this Complaint, Defendants engage in a far-reaching scheme to defraud consumers who use Android[3] smartphones. That is, Defendants work together to deceptively cause Android users to become subscribed to GoLive's so-called mobile services so that GoLive can impose recurring and sometimes endless monthly charges onto their wireless telephone statements.

3.      Defendants accomplish this highly complex fraud by disguising Airpush's mobile advertisements as official-looking Android system notifications. By doing so, Defendants trick

---

[1]     Smartphones are wireless telephones and other electronic devises that, akin to a portable computer, generally provide data and Internet access, as well as the ability to run applications using the mobile device's operating system (*e.g.*, Android).

[2]     "Mobile content" generally refers to various forms of products and services accessible through mobile phones, including without limitation: ringtones, discount offers, mobile banking, GPS navigation, games, text messaging services, and movies.

[3]     Android is a mobile device operating system developed by Google, Inc. Many smartphones, including certain devices manufactured by HTC Corp. and the Samsung Group, utilize the Android operating system.

consumers into believing that these advertisements are Android sanctioned notifications and convince consumers to enter their telephone numbers to download or update their software. GoLive then uses the telephone numbers to convince the consumer's wireless carrier that the individual voluntarily subscribed to one of its "premium" mobile services. This, in turn, causes GoLive's services to be added to the individual's telephone bill every month, at a cost of $9.99. Unfortunately, consumers remain unaware that they have unwillingly become subscribed to one of GoLive's services until they receive the charge on their telephone bill.

4.      By and through these processes, and as explained more fully below, Defendants have made millions of dollars by deceiving thousands of hapless consumers—all in violation of Colorado law.

## PARTIES

5.      Plaintiff Kimm Nordman is natural person and resident of the State of Ohio.

6.      Defendant GoLive is a limited liability company organized in and existing under the laws of the State of Delaware, with its headquarters and principal place of business located at 10940 South Parker Road, Suite 736, Parker, Colorado 80134. GoLive does business throughout the State of Colorado, this District, and the United States.

7.      Defendant Airpush is a corporation incorporated in and existing under the laws of the State of Delaware, with its headquarters and principal place of business located at 11400 West Olympic Boulevard, Suite 200, Los Angeles, California 90064. Airpush does business throughout the State of Colorado, this District, and the United States.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because (a) at least one member of the putative Class is a citizen of a state different from Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

9.      This Court has personal jurisdiction over Defendants because they are registered to conduct business in this District, they conduct significant business in this District, and the unlawful conduct alleged in the Complaint occurred in, was directed to, and emanated from this District. Additionally, this Court has personal jurisdiction over GoLive because it maintains its headquarters and principal place of business in this District.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside in this District and because the decisions resulting in the unlawful conduct alleged in this Complaint originated in and emanated from this District. Venue is additionally proper because GoLive maintains its headquarters and principal place of business in this District.

## FACTUAL BACKGROUND

**I.      An Overview of Defendants GoLive and Airpush**

11.     Defendant GoLive is one of the fastest-growing mobile media companies in the United States and offers a variety of mobile content, billing, strategy, and performance services to companies worldwide.[4]

---

[4]      GoLive Website, http://www.golivemobile.com/aboutus.htm (last accessed December 11, 2012).

12.     Two main segments comprise GoLive's business model. First, GoLive provides billing solutions to companies seeking to monetize their mobile products and services by facilitating payment transactions between companies, consumers, and wireless carriers (*i.e.*, Verizon Wireless or AT&T). By way of example, in a transaction where a consumer buys certain mobile services from a third party, the company offering the services informs GoLive of the consumer's purchase. GoLive then communicates that message to the wireless carrier, who imposes the charge on the consumer's monthly telephone statement. GoLive also offers its own "premium" mobile content services. Most often these "services" are simply text alerts (*i.e.*, consumers are sent information like weather forecasts or celebrity gossip via text messages in exchange for a monthly recurring fee charged to their telephone bills).

13.     These products and subscription services—referred to as "premium mobile content," or "premium SMS" (short for "Short Message Services")—are commonly offered to consumers through enhanced media-based text messages. The earliest and perhaps most readily recognizable example of this are customized ringtones that were transferred using SMS. Today, thousands of services are available via premium SMS. GoLive, for example, offers the following premium SMS services on a monthly subscription basis: (i) Jumpah, a service that provides daily weather forecasts via text message for $9.99 per month; (ii) ZapVideo, a service that provides users with celebrity news and gossip alerts via text message for $9.99 per month; and (iii) App Tram, a service that alerts users about new mobile applications ("apps") for $9.99 per month.

14.     Defendant Airpush is a mobile advertising company that operates the second

largest advertising network (or "ad network") for Android developers.[5]

15.     Airpush creates technology that software developers use to monetize their mobile apps. In simplest terms, Airpush's technology (one piece of its "ad network") serves targeted advertisements to Android smartphone users. Although traditionally this advertising technology enabled only the display of advertisements within the apps themselves, Airpush is principally known for its proprietary method to seamlessly present advertisements to Android users *outside* of apps, and within the mobile device's main home screen.

16.     While certain of the companies' business operations are seemingly legitimate, Airpush and GoLive have developed a potent form of fraud by leveraging their collective ability to seamlessly display deceptive advertisements to Android users and then cause charges to a consumer's telephone statement under the guise of subscription "premium services."

## II.     Mobile Content Providers Contract with Billing Aggregators to Charge Consumers' Monthly Phone Bills for their Services

17.     Mobile content providers ("MCPs")—companies, like GoLive, that offer premium SMS services—are unable to independently bill their services to consumers' telephone statements. Accordingly, MCPs rely on wireless carriers like AT&T or Verizon Wireless to add charges for their services as a line item on the consumer's monthly telephone bill. Significant barriers to entry in this industry, however, make it difficult to communicate directly with the wireless carriers. As a result, MCPs contract with "billing aggregators" to act as their liaisons.

18.     Billing aggregators are the middlemen between MCPs and wireless carriers,

---

[5]     Airpush Website, http://www.airpush.com/aboutus (last accessed December 11, 2012).

forwarding notice of the MCP's charge to the wireless carrier so that it can be added to a consumer's telephone statement. To complete this process, billing aggregators require surprisingly little information—generally only the consumer's cellular telephone number.

19.      GoLive is in a unique position: it is both a MCP and a billing aggregator. This means that GoLive has the in-house capability to subscribe a consumer to its premium services *and* then cause corresponding charges to be imposed on the individual's telephone bill. Yet GoLive still must attain consumers' cellular telephone numbers along with a pre-textual "cover" for the fee charged to their monthly statements. Airpush provides that missing piece, and it's not difficult to identify the link between the Defendants—GoLive's co-founder and sitting chairman, Asher Delug, is also the founder and CEO of Airpush.

### III.   Using Airpush's Technology as a Conduit, GoLive Surreptitiously Subscribes Consumers to its Premium Services and "Crams" their Monthly Phone Statements

20.      Located towards the top of the Android smartphone display screen is a system status bar that informs a user when he or she receives a "notification." *See* Figure 1 (showing a notification message on the left side on an Android status bar).[6] Typical notifications include upcoming calendar events, or the existence of a newly received e-mail.



(**Figure 1.**)

21.      Upon clicking a notification in the system status bar—for example the image of a

---

[6]      System status bar images and information acquired from the Android developer webpage, accessible at http://developer.android.com/guide/topics/ui/notifiers/notifications.htm (last accessed December 11, 2012).

post card or letter shown in Figure 1—a drop-down menu is displayed to the user containing

more detailed information about the notification. *See* Figure 2 (showing an expanded preview of

the message received from an individual named Travis who states, "Where you at?" [sic]).



(**Figure 2.**)

22.     Airpush's rise to prominence in the ad network industry was based in part on the

fact that it developed a way to cause notifications to appear within this system status bar—

notifications that lead to *advertisements* rather than system messages. This technique has lead to

significant backlash from Android users and even spurred programmers to create "Airpush

detector and removal" software that prevents Airpush's notifications.[7]

23.     Many Android users don't understand how Airpush is installed on their mobile

devices in the first place. The problem is that Airpush's software is embedded within mobile

---

[7]     *See, e.g.*, Sneaky Mobile Ads Invade Android Phones,
http://www.pcworld.com/article/245305/sneaky_mobile_ads_invade_android_phones.html (last
accessed December 11, 2012); Airblocker – Airpush Blocker,
https://play.google.com/store/apps/details?id=pl.byq.airblocker&hl=en (last accessed December
11, 2012); Airpush Detector,
https://play.google.com/store/apps/details?id=com.brosmike.airpushdetector&hl=en (last
accessed December 11, 2012).

apps, a fact often undisclosed during the installation process. Accordingly, many users don't recognize the causal connection between Airpush's system status bar notifications and an app they installed days or weeks prior. Moreover, because Airpush's advertisement notifications appear alongside standard system messages, consumers are understandably unable to differentiate between the two. This confusion allows Defendants to convince users that GoLive's advertisements are actually legitimate system notifications.

24.     By way of illustration, in some instances Airpush inserts an official-looking notification icon onto an Android user's system status that indicates an update is available to the Android Market (Android's digital marketplace where users can download apps for use on their Android smartphones). Once expanded, the notification appears to be an official looking message originating from the smartphone itself. *See* Figure 3 (showing the expanded view of the notification message in question, complete with the official Android logo).



(**Figure 3.**)

25.     Although these notifications appear to be official, Android-sanctioned system messages, they are actually sinisterly designed advertisements. Once a user clicks on one of these messages, he or she is forwarded to a website where the user's cellular telephone number is requested by GoLive. GoLive then sends the telephone number to the consumer's wireless carrier with instructions to begin charging the consumer approximately $10 dollars per month for its services. In the telecommunications industry, this tactic is known as "cramming."

26.     The Federal Trade Commission ("FTC") recognized the dangers of "cramming" as early as 1998 when it asserted that cramming is "an age-old abusive practice" that is "novel only in that it uses a previously unavailable means to effect unauthorized billing—namely, the telephone billing and collection system."[8] Cramming, the FTC explained, is "causing significant harm to American consumers," and is compounded by virtue of the fact that "any party capable of capturing a consumer's telephone number can cause charges for a product or service to be included on that consumer's phone bill."[9]

27.     During that pre-smartphone era, the FTC warned of malicious actors acquiring telephone numbers "through purported sweepstakes that require a phone number on an entry form, or even through simply drawing numbers at random from the telephone directory."[10] Thus, although perhaps more technologically advanced, Defendants' fraudulent scheme, when distilled,

---

[8]     Eileen Harrington, Prepared Statement of the FTC on "Cramming" (http://www.ftc.gov/os/1998/09/cramm998.htm) (1998).

[9]     *Id.*

[10]     *Id.*

is simply a new twist on this time-honored fraud.

**IV.    GoLive's Inconspicuous Charges and "On Demand" Text Alerts**

28.     GoLive's charges appear on a consumer's monthly statement bearing the name of one of its text alert services described above, such as "Jumpah" or "App Tram"—none of which are actual registered business entities. Consequently, consumers who are crammed by GoLive are unable to discern the company from which these charges originate.

29.     Worse, GoLive's premium services are offered "on demand." This means that when a consumer becomes subscribed to one of GoLive's services, he or she does not automatically begin receiving text alerts. Rather, each and every time a subscriber seeks the benefit of GoLive's services, the consumer must affirmatively send a text message to a telephone number owned by the company, at which point GoLive sends back a text alert (importantly, Plaintiff Nordman and members of the putative Class were not presented with this telephone number, thus could not possibly utilize GoLive's services).

30.     The intent and effect of these business practices are obvious: because only those consumers who willingly subscribe to GoLive's services are able to utilize them, individuals like Plaintiff Nordman who've been tricked into providing Defendants with their telephone numbers remain unaware that they are GoLive subscribers until after they have already been charged for its services.

31.     Thus, by the time Nordman and the other putative class members identify GoLive's charges (or, more precisely, one of its business affiliates' charges)—generally after viewing their telephone statement—they are already on the hook for a monthly recurring fee.

Worse, GoLive frustrates their ability to stop such charges, or obtain a refund. All the while, Defendants reap millions in ill-gotten profits.

**V.      Plaintiff Kimm Nordman's Experience**

32.      In early 2012, Plaintiff viewed a notification on her Android smartphone—that looked substantially similar to the notification depicted in Figure 3 above—which advised her to download and/or update the software on her phone. On information and belief, the notification was an advertisement published and/or displayed by Airpush.

33.      Reasonably believing that the advertisement was an Android-sanctioned notification, Plaintiff clicked on it and was directed to a website that, on information and belief, was owned and operated by GoLive. While on the website, Plaintiff recalls entering her telephone number to initiate the download of new software, but she never consented to be billed for any product or service.

34.      Plaintiff was subsequently charged a $9.99 fee to her monthly telephone statement that read, "PREM-SMS 23542 App Tram Alerts $9.99." On information and belief, the "App Tram Alerts" service is owned and operated by GoLive. Yet, at no time did Plaintiff ever authorize or consent to being charged for subscription services offered by GoLive, nor did GoLive ever attempt to verify Plaintiff's purported authorization of such charges.

35.      Since the appearance of the original fee, Plaintiff has been charged each and every month, despite numerous complaints to her wireless carrier, Verizon Wireless.

36.      Plaintiff has never used GoLive's "App Tram" subscription service, nor has she ever been provided with a means to unsubscribe from the service.

**CLASS ALLEGATIONS**

37.     **Definition of the Class**. Plaintiff Kimm Nordman brings this action pursuant to

Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of herself and a Class of similarly situated

individuals, defined as follows:

> All individuals in the United States who were charged for GoLive's premium services,
> through an Airpush notification, without consent.

Excluded from the Class are (1) Defendants, Defendants' agents, subsidiaries, parents,

successors, predecessors, and any entity in which the Defendants or their parents have a

controlling interest and their current and former employees, officers, and directors, (2) the Judge

or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's

immediate family, (3) persons who execute and file a timely request for exclusion, (4) persons

whose claims in this matter have been finally adjudicated on the merits or otherwise released,

and (5) the legal representatives, successors, or assigns of any such excluded person.

38.     **Numerosity**. The exact number of Class members is unknown to Plaintiff at this

time, but on information and belief, Defendants have caused thousands of Class members

throughout the country to be deceptively charged for GoLive's premium services, making

joinder of each individual member impracticable. Ultimately, the Class members will be easily

identified through Defendants' records.

39.     **Typicality**. Plaintiff's claims are typical of the claims of the other members of the

Class. Plaintiff and the Class sustained damages as a result of Defendants' uniform wrongful

conduct during transactions with Plaintiff and the Class.

40.     **Adequate Representation**. Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class and Defendants have no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiff nor her counsel has any interest adverse to those of the other members of the Class.

41.     **Superiority**. This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The damages suffered by the individual members of the Class will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' wrongful conduct. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

42.     **Policies Generally Applicable to the Class**. This class action is also appropriate

for certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class, and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply and affect members of the Class uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the other members of the Class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward members of the Class. The factual and legal bases of Defendants' liability to Plaintiff and to the other members of the Class are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the members of the Class have suffered harm and damages as a result of Defendants' unlawful and wrongful conduct.

43.     **Commonality and Predominance**. There are several questions of law and fact common to the claims of Plaintiff and the members of the Class, and those questions predominate over any questions that may affect individual Class members. Common questions for the Class include, but are not limited to, the following:

a)   whether Defendants' conduct as described herein violates the Colorado Consumer Protection Act, C.R.S. §§ 6-1-101, *et seq.*; and

b)   whether Defendants have unjustly received money belonging to Plaintiff and members of the Class, and whether, under principles of equity and good

conscience, Defendants should not be permitted to retain it.

44.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Definition of the Class" based on facts learned in discovery.

**COUNT I**
**Violations of Colorado Consumer Protection Act**
**C.R.S. §§ 6-1-101, *et seq.***
**(On behalf of Plaintiff and the Class)**

45.     Plaintiff incorporates the foregoing allegations as if fully alleged herein.

46.     The Colorado Consumer Protection Act, C.R.S. §§ 6-1-101, *et seq.* (the "CCPA"), prohibits any person from engaging in any unfair or deceptive practices during the course of such person's business.

47.     Specifically, the CCPA prohibits any person from failing to disclose "material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." C.R.S. § 6-1-105(1)(u).

48.     As alleged herein, Defendants, acting with knowledge, intentionally and unlawfully violated, and continue to violate the CCPA by inducing Plaintiff and members of the Class, through deceptive Android advertisements, to provide Defendants with their telephone numbers so that GoLive could charge their monthly phone bills without consent. That is, Airpush intentionally designed its advertisements in a manner intended to lure Plaintiff and members of the Class into providing their telephone numbers to GoLive. Defendants collected Plaintiff's and the Class's telephone numbers so that GoLive could fraudulently impose $9.99 charges onto

their wireless telephone bills every month.

49.     Moreover, GoLive falsely represented, and continues to misrepresent, to wireless carriers that Plaintiff and the Class members approved, authorized, and/or consented to charges for premium SMS services, when in fact they did not.

50.     As a direct result of Defendants' failure to disclose important information regarding GoLive's services, including price, subscription period, and cancellation procedures, Plaintiff and the Class members incurred monthly recurring fraudulent charges.

51.     At the time Defendants omitted material information—*i.e.*, when Plaintiff and the Class members unwittingly subscribed to GoLive's services—Defendants necessarily knew the information they were withholding. As purveyors of the services, they knew the price of the services, the subscription period, the cancellation procedures, and all other material information relating to the services.

52.     Defendants' intentional omission of material information regarding GoLive's services—including the price, subscription period, and cancellation procedures—were intended to deceive Plaintiff and the Class into subscribing to GoLive's services, and into paying for these services indefinitely.

53.     Defendants' unlawful omissions occurred during the advertisement and provision of GoLive's premium SMS services. Thus, the omissions occurred in the course of Defendants' businesses.

54.     The public is significantly impacted by Defendants' unlawful conduct because thousands of consumers have already been deceived into paying for services that they are

unaware of, and consumers are at risk of further harm from Defendants' unlawful and deceptive practices. Further, absent this lawsuit, consumers have no bargaining power in dealing with Defendants, and will be unable to obtain redress for their injuries.

55.     Plaintiff and the Class members suffered injury-in-fact to legally protected interests in the form of the money unlawfully and deceptively charged to them by Defendants.

56.     Defendants' conduct directly caused Plaintiff and the Class injuries. But for Defendants' material omissions regarding the price, subscription period, and cancellation periods for GoLive's services, Plaintiff and the Class members would not have been charged fees by Defendants.

57.     Plaintiff, on her own behalf and behalf of the Class, seeks damages from Defendants' fraudulent and deceptive practices, as well as attorney's fees and costs.

**COUNT II**
**Restitution/Unjust Enrichment**
**(On behalf of the Plaintiff and the Class)**

58.     Plaintiff incorporates the foregoing allegations as if fully alleged herein.

59.     Plaintiff and the Class conferred a benefit upon Defendants. Specifically, Defendants have received and retained Plaintiff's and the Class members' money by deceptively obtaining their telephone numbers and charging them monthly fees for GoLive's services as alleged herein.

60.     Defendants appreciate or have knowledge of said benefit.

61.     Because Defendants obtained their monetary benefit directly from Plaintiff and the Class, Defendants' benefit was obtained at Plaintiff's and the Class members' expense.

62.     Under principles of equity and good conscience, Defendants should not be permitted to retain the money taken from Plaintiff and the Class members through their unlawful business practices.

63.     Plaintiff and the Class members have suffered loss as a direct result of Defendants' conduct in the form of the charges added to their monthly phone bills.

64.     Plaintiff, on her own behalf and behalf of the Class, seeks the restitution of the proceeds from the unauthorized charges Defendants have benefitted from, as well as attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kimm Nordman, on her own behalf and on behalf of the other members of the Class, respectfully requests that this Court enter an Order:

a)  Certifying this case as a class action on behalf of the Class as defined above, appointing Kimm Nordman as representative of the Class, and appointing her counsel as Class Counsel;

b)  Declaring that the actions of Defendants, as set out above (i) violate the Colorado Consumer Protection Act, C.R.S. §§ 6-1-101, *et seq*., and (ii) constitute restitution/unjust enrichment;

c)  Awarding damages to Plaintiff and the Class in an amount to be determined at trial;

d)  Awarding restitution to Plaintiff and the Class in an amount to be determined at trial, and requiring disgorgement of all monies by which Defendants were

unjustly enriched;

e)   Awarding Plaintiff and the Class their reasonable litigation expenses and

attorney's fees;

f)   Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent

allowable;

g)   Entering judgment for injunctive and/or declaratory relief as is necessary to

protect the interests of the Plaintiff and the Class; and

h)   Awarding such other and further relief as equity and justice may require.

### JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated:  December 11, 2012      **KIMM NORDMAN**, individually and
on behalf of all others similarly situated,

By:   /s/ Steven L. Woodrow
One of Plaintiff's Attorneys

STEVEN L. WOODROW #43140
(swoodrow@edelson.com)
MEGAN L. LINDSEY #43817
(mlindsey@edelson.com)
EDELSON MCGUIRE, LLC
999 18th Street, Suite 3000
Denver, Colorado 80202
Tel: (303) 357-4878
Fax: (303) 446-9111

JAY EDELSON (*Application for Admission to be Filed*)
(jedelson@edelson.com)
RAFEY BALABANIAN

(rbalabanian@edelson.com)
ARI SCHARG (*Application for Admission to be Filed*)
(ascharg@edelson.com)
CHANDLER GIVENS (*Application for Admission to be Filed*)
(cgivens@edelson.com)
EDELSON MCGUIRE LLC
350 North LaSalle Street, Suite 1300
Chicago, IL 60654
Tel: (312) 589-6370
Fax: (312) 589-6378

*Attorneys for Plaintiff and the Putative Class*